IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE STATE OF IOWA

CHRISTOPHER LEE KING
    & all similarly situated individuals
    Applicant,

vs.

STATE OF IOWA,
Beth Skinner, Director, Iowa Department of Corrections
Shawn Howard, Warden, Newton Correctional Facility
Shawn Crawford, Associate Warden, Newton Correctional Facility

No.4:23-cv-00072-SMR-HCA



MOTION FOR JUDGEMENT FOR CRUEL & UNUSUAL PUNISHMENT - INCLUDING SLEEP DEPRIVATION, PHYSICAL, EMOTIONAL AND PSYCHOLOGICAL TRAUMA.

COMES NOW the Applicant, Christopher Lee King, incarcerated by the Iowa Department of Corrections (IDOC) at the Newton Correctional Facility (NCF), acting pro se, and files this motion for The Court to accept pro se testimony in the above action.

1. This action satisfies the requirements to state a claim under 1983 as The Applicant is being deprived of a basic human right, the right to full and restful sleep of at least 6 consecutive hours and the right to be free from constant illumination causing additional damages, by persons acting under color of state law.
2. The respondent houses the applicant and hundreds of others in severe and constant lighting conditions that are in violation of basic human rights and amount to cruel and unusual punishment, protected by the 8th amendment to the United States Constitution.
    a. On or about April 15th of 2022, Defendant Crawford ordered cell lights be fully illuminated (without the ability for manual override from switches in rooms) from 0700 until the completion of the 2115 evening count, which is typically around 2145 (14 hours and 45 minutes).
    b. Due to overcrowding, the Applicant is forced to inhabit a sleeping bunk with his head in constant proximity of 12-14 inches of the cell's only light source.
        i. Hundreds of other individuals within the facility are housed in the same manner.
            1) Only "3-man," rooms are laid out in the manner which forces the head to be under the light fixture. The 3-bunk layout is not how the facility was designed. In

order to crowd more bodies into the same space, a large number of rooms were retrofitted with the 3 bunks.

   2) The "2-man," cells are laid out in such a manner as to keep the light at least 4' from the heads of the bunk occupants.
  ii. Light exposure in this manner is 24-hours a day, 365 days a year.
   1) Illumination from the fixtures is for 24-hours per day.
   2) When the Applicant occupies his sleeping bunk, his eyes are within 12-14 inches of the light source. The bunks are mounted so closely to the ceiling of the cell that it is impossible for the Applicant to be in a seated position, therefor, he must be laying on his back or side, exposing him to the light.
  iii. Light exposure disrupts the Applicants sleep patterns, causes headaches and eye fatigue and generates severe anxiety and feelings of being spotlighted and targeted.
   1) Light-gray and white sheets, issued by the institution, as well as white walls and ceilings, reflect the intense light in the restricted space, amplifying the effects of the intense light.
 c. The Applicant begs The Court to recognize that the above treatment of any inmate is, on its face, cruel and unusual.
   1) Virtually every night, the Applicant dozes off, only to be shocked awake by the light when various head coverings slip away from his face.
    a. The Applicant has attempted to remedy the light issue with the use of towels, shirts, sleep masks and knit hats, none of which should be required for a person to sleep, unless desired. However, these items do not stay in place and, in fact, make the issue worse. Additionally, correctional staff do not allow the entire concealment of an inmate's head.
     i. Sleep masks are required to be purchased from the prison canteen by the Applicant. They consist of a black panel of poly fabric with a small, thin band of elastic attached. The elastic either rips free from the fabric panel or the elastic stretches so far as to make the mask unusable. Generally, the masks, as sold, are useless within a couple of weeks.

      ii. Towels and shirts placed over the head have caused breathing and respiratory problems. Additionally, the trapped exhaled air beneath these items raises the temperature beneath them to intolerable levels.

      iii. The use of a knit cap, pulled down over the eyes, causes fibers to tickle the face and nose, waking the wearer. Additionally, the Applicant suffers from the genetic disorder, Osler-Weber-Rondeau (sp?) Syndrome. The Applicant's arteries in his nose are very near the surface of the inside membranes of his nasal cavities and abnormaly thin. Approximately twice a week, the Applicant is awakened because his nose has been irritated by the fibers over, on or around it, causing him to rub his nose if he falls asleep. The nose then bleeds profusely and the Applicant is forced to lay on his back, facing the ceiling, while he tries to stop the bleeding. On multiple occasions, the Applicant has swallowed enough blood as to become nauseated. The nosebleeds rarely occur at any other time with the exception of attempting to sleep with a face covering to eliminate the bright light.

b. On a regular basis, when sleep is obtained, the Applicant's sleep is interrupted, and he fails to be able to get back to sleep due to the bright environment, resulting in exhaustion and fragmented sleep that comes mostly when his body shuts down and forces sleep.

    i. While lying awake, trying to sleep, the Applicant lays in his bunk idly, which often leads to painful and damaging ideations of his past and his future, some of which are, in no way, based in reality.

c. Since being forced to reside in a room with the described lighting, Applicant has developed cardiovascular and digestive issues which were not present or known, prior.

    i. These issues include transitory chest pain and palpable transient dysrhythmia.

    ii. Tachycardia.

iii. Colorectal bleeding to such an extent that the Applicant must be seated on a toilet for as long as 20 minutes.
  1. The Applicant has visited Health Services within the institution and is awaiting appointments with outside health care providers.
d. The Defendant (The State, including Correctional Officers) has no way to monitor or know if the Applicant is asleep while in his bunk as the Applicant's eyes are covered, to a great degree, at all times. In order to watch television, the Applicant must view the program from a small slit at the bottom of whatever is being used to shield his vision from the harsh light above him.
e. The actions of the respondent are recognized by the United Nations (Mandela Standards) as torture.
f. Inmates forced to occupy a top-bunk have no respite, whatsoever, from this cruelty.
  i. All inmates are forced to watch their personal television sets from their sleeping bunks.
g. All cells on the Applicant's housing unit have manual light switches on the wall, which would allow for manual control of the light, by the inmates, if not overridden.

3. The Applicant's behavior during his incarceration has been excellent.
   a. The Applicant is currently housed on, what is considered, an "honor unit."
      i. The Applicant would be considered "minimum security," if he had completed treatment, in which he is now taking part.
      ii. The housing unit that the Applicant is on is a totally separate building from all other housing units. Major behavioral issues on this housing unit are virtually non-existent.
      iii. The cell doors on the living unit occupied by the Applicant are wooden doors with keyed locks to which the cell's inmates have the key.
      iv. For the past 2 years, the Applicant has been enrolled in college courses from Grinnell College in an effort to enrich his knowledge.
      v. The Applicant has his high school diploma and B.A. degree.
      vi. The Applicant was a Nationally Registered Emergency Medical Technician – Paramedic Specialist (NREMT-PS) and business owner before his incarceration.
      vii. The Applicant currently has a Post-Conviction Relief case before the Iowa Supreme Court for ineffective assistance of counsel.

4. Any argument by the Respondent that the current room lighting in the Applicant's cell are required for security are false.

a. The current, constant illumination of the cells represents no legitimate governmental objective in light of the totality of the circumstances for the following reasons:
    i. The State has declared that the reason for the lighting is to force inmates from their cells. This declaration is anti-security driven because, as an inmate, the Applicant knows and attests, with personal knowledge following nearly 7 years of incarceration, that forcing inmates into contact with one another leads to conflicts and fights. The Applicant should be recognized by The Court as having "expert," knowledge of the inner-workings of the prison environment in which he resides. The Defendants are seen on the living units for a matter of minutes each month and then, almost exclusively, during head counts when all inmates are restricted to their cells.
b. While it may once have been required to have visible light to see occupants of a cell, technology now exists that would allow security checks without any visible light.
    i. Forward Looking Infrared (FLIR), heat signature and visible light magnification technologies all could be used by security staff to verify bunks are occupied.
c. The institution conducts 6 head counts per day. Half of these counts are conducted with the daytime lighting and half are conducted with the night lighting.
    i. Would the Defendant attest/conceed that the head counts conducted using only the night lights are less secure, valid or safe than those conducted with the daytime lights on?
d. Even though the bunks partially obscure the small windows in the cell, daylight coming through the windows illuminates the cell to some degree during seasonal daytime hours.

5. Respondents Crawford and Howard are specifically aware of the issues brought by this action and are knowingly, willingly and with malice aforethought, continuing to inflict the damages named herein with deliberate indifference.
    a. In Zatko v. Rowland, 835 F. Supp. 1174, 1993, the court found that constant illumination of a jail cell with bright light, which deprived **normal** (emphasis added) sleep "would violate his basic right to shelter."
        i. Additionally, unlike the Zatko case, the stated purpose of the lighting policy is to keep inmates awake during the Defendant's desired schedule. This, alone, represents a clear constitutional violation.

6. Respondent Crawford issued a memo in approximately April of 2022, posted and broadcast on institutional television, stating that his intent when directing this cruelty was to force individuals out of

their cells in order to coerce them into work and treatment. This represents a group punishment and a violation of basic human rights.

   a. The Court has found, in Lemaire v. Maass, "there is no legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination. This is unconstitutional." LeMaire v. Maass, 745 F. Supp. 623, 636 (D. Or. 1990)
      i. In LeMaire, the State agreed to modify their actions in a settlement.
7. All administrative remedies have been exhausted on this matter.
8. Now that this action has been filed and the Applicant has established standing in The Court, any attempt to relocate or change the housing assignment of the Applicant will be viewed as retribution and an attempt by the Defendant to change the Applicant's standing with The Court.
9. The Applicant begs The Court to compel the Defendant to provide the following in order to satisfy The Courts inquiry into lighting intensity:
   a. A certified reading of the actual lumens (light) striking the Applicant's face while the light fixture is fully lit.
   b. A certified reading of the actual lumens (light) striking the Applicant's face while the light fixture is in its "night light," state.
   c. A photograph of the Applicant's cell, taken from the door of the cell, showing the 3 sleeping bunks and their proximity to each other, as well as the light fixture.
   d. A photograph of a "2-man" cell to illustrate to The Court how cells, in the same living unit, are arranged differently. The "2-man," cells are how the facility was designed to be laid out.
      i. It should be noted that, in his estimation, the "dimmed overnight," lights illuminate the Applicant's face in excess of the lumens put off by a 75-watt incandescent light bulb. However, the lights are light emitting diodes (LEDs) which provide a colder, much harsher light than most incandescent bulbs.
10. The Applicant begs The Court to recognize that the Applicant has no practical access to on-line or electronically published materials that would support the Applicant's claim.
    a. This access to The Courts and to creating compelling legal arguments is totally denied by the Defendant.
11. The Applicant begs The Court to recognize that the Applicant has severely limited access to printing for the purposes of filing legal work.
    a. The institution does not provide for printing on the housing units. The housing units are the only location where computers are available for preparing legal work.

i. Printing must be completed in the institution's library which is only open a few hours a week and only allows for printing a fraction of the time it is open.
12. The Applicant wishes to correct the record from the "INITIAL REVIEW ORDER," filed 5/5/23. Page 3, lines 3&4, the record states a claim of "constant," headaches. The word, "constant," should be amended to read, "frequent."

The Applicant hereby pleads with the Court to order IMMEDIATE CORRECTIVE ACTION for the Applicant(s). Due to the ongoing suffering and health implications, the Applicant begs the Court to take immediate corrective action and recommends the following:

1) NCF immediately correct all sleeping bunks or light sources so that no bunks are mounted within 4' of a light source.
2) Create a solution allowing individuals to fully control lighting in their cells during non-count times.
3) Assign financial penalties and awards to the Applicant as the court sees fit.

The Applicant declares inadequate funds to pay Court costs associated with this action.

Respectfully submitted,

Christopher Lee King, #6565329, pro se
Newton Correctional Facility
PO Box 218
Newton, IA 50208

Cc/------------------

Copies mailed to:

United States District Court
U.S. Courthouse

Christopher L. King - 6565329
7

P.O. Box 9344
Des Moines, Iowa 50306-9344

Chris King - 6565329
NCF
PO Box 218
Newton, IA 50208



Clerk
United States Dist. Court
P.O. Box 9344
Des Moines, IA 50306-9344

NOTICE: This Correspondence was mailed from an institution of the Iowa Department of Corrections